**UNITED STATES of America**

v.

**John M. POINDEXTER.**

**Crim. No. 88–0080–01 (HHG).**

United States District Court,
District of Columbia.

Dec. 21, 1989.

---

**1502**

Lawrence E. Walsh, Independent Counsel, Dan K. Webb, Louise R. Radin, Christian J. Mixter, Howard M. Pearl, Associate Counsel, Office of the Independent Counsel, Washington, D.C., for the U.S.

Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson and Michael G. McGovern, Fulbright & Jaworski, Washington, D.C., for defendant John M. Poindexter.

Theodore B. Olson, John A. Mintz, Michael B. Rappaport and Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, D.C., for Former President Ronald W. Reagan.

David Anderson, James S. Reynolds, Thomas Millet and Douglas Letter, U.S. Dept. of Justice, Washington, D.C., for the U.S. and the Archivist of the U.S.

## OPINION

HAROLD H. GREENE, District Judge.

The issue before the Court is what procedures should govern the Court's consideration of a request by defendant for enforcement of subpoenas *duces tecum* for documents from former President Ronald W. Reagan, the documents to be used in the defense against charges of false statements to and obstruction of Congress. There are few historical precedents to guide the Court, and each of these arose in its own peculiar context and may therefore not necessarily be controlling. This Court has been governed by the following principles.

What is here involved is a clash between two sets of rights—that of an accused in a criminal case to relevant evidence needed for his defense, and that of a former Chief Executive to be free from coercion with respect to his papers containing both personal observations and comments on matters of state. The subject is one of both delicacy and difficulty, for significant constitutional and public policy considerations underlie both sets of rights. The Court has accordingly sought to fashion a procedure that will accommodate the interests of the defendant as well as those of the former President, and to minimize injury to both.

## I

### *Facts*

On July 31, 1989, defendant moved under Rule 16, Fed.R.Crim.P., to require the government[1] to produce the diaries and notes of President Reagan.[2] When the government responded that these materials were not in its possession, defendant

1. Here, as in previous Opinions, the Court will generally refer to those prosecuting the instant charges, *i.e.,* the Independent Counsel and his staff, as the government. However, where this is necessary for clarity in the particular context, the prosecutors will be referred to as the Independent Counsel. The Attorney General and the Department of Justice which, as seen below, have significant interests in the outcome of the pending motion, are referred to as the Department of Justice.

2. Former President Ronald W. Reagan will for the sake of brevity be referred to herein as President Reagan or as the former President.

agreed to seek them instead by subpoenas pursuant to Rule 17(c), Fed.R.Crim.P., directly from President Reagan and the Archivist of the United States. As a prerequisite to its authorization for the issuance of such subpoenas, the Court required defendant to submit to it for its *in camera, ex parte* inspection, a proffer describing in some detail the basis for his assertion that the documents being sought contain information that may be material to the defense. Following its review of this proffer, the Court authorized the issuance of the subpoenas defendant had submitted.[3]

Motions to quash were filed on December 6, 1989, by his attorneys on behalf of President Reagan and by the Department of Justice on behalf of the Archivist of the United States as well as on behalf of the interest of the incumbent Chief Executive in the unimpaired constitutional responsibilities of the Presidency. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 448–49, 97 S.Ct. 2777, 2792–93, 53 L.Ed.2d 867 (1977); *Nixon v. Freeman*, 670 F.2d 346, 356 (D.C.Cir.1982); *Public Citizen v. Burke*, 843 F.2d 1473 (D.C.Cir.1988). Defendant's response was submitted December 14, 1989, and the question of the appropriate procedure is now ripe for decision.

## II

### The Bifurcation Issue

■ In addition to claiming that the subpoenas are unreasonable and oppressive, the motions to quash make reference to the doctrine of executive privilege, but they go on to argue that the Court should defer decision on the privilege issue and address at this time only the scope of the subpoenas. The defendant objects to this approach, contending that the Court should not undertake the complicated task of attempting to narrow the subpoena in advance of dealing with the executive privi-

lege question. In his view, President Reagan and the Department of Justice are not entitled to a bifurcated process: the issue of the scope of the subpoena and that of executive privilege should be decided at the same time.

In support of their contention that the Court should attempt to narrow the subpoena before requiring the former President to assert or to waive executive privilege, President Reagan and the Department of Justice argue that, in view of the role of the President in our constitutional structure, a former or incumbent President should be presented with the narrowest possible process. In implementation of that design, it is said, it is undesirable as a matter of constitutional and public policy to compel a President to make his decision on privilege with respect to a large array of documents some or many of which may ultimately turn out to be exempt from production for other, non-constitutional reasons.

Defendant makes several points to buttress his contention that President Reagan and the Department of Justice should not be permitted to advance their objections to the subpoena in two stages, and that unless executive privilege is claimed now, the Court should refuse to subject the subpoena to the "meticulous review" the former and the incumbent President claim to be required. These arguments will now be considered seriatim.

### A. Political Issues

Defendant claims, first, that the former and the incumbent President should not be permitted to avoid the "political consequences of their invoking the privilege."[4] This argument is without legal merit. The Court has no concern with the political consequences, if any, from a delay in the assertion of executive privilege. Indeed, if it should ultimately turn out that the privilege is never asserted (*see* below), the

---

3. Contrary to defendant's assumption (Defendant's Memorandum at 21–22, 23–24), this authorization did not represent a determination that the subpoenaed documents were required to be disclosed by the recipients irrespective of such possible objections as lack of materiality or executive privilege. The Court always assumed that objections of that kind would be litigated in the context of motions to quash.

4. Defendant's Memorandum at 10.

Court would not have to decide the delicate constitutional questions that would arise from a clash between the privilege and Poindexter's need for documents essential to his defense. Far from constituting a negative factor, therefore, the avoidance of a decision on such constitutional questions unless and until truly necessary is mandated by a long line of Supreme Court decisions, beginning with Justice Brandeis' concurrence in the *Ashwander* case, *infra.*

## B. *Extended Proceedings*

Defendant further contends, with somewhat greater plausibility, that to defer consideration of the executive privilege issue until a later date would be to add a second and unnecessary briefing stage to the proceedings and thereby delay a final decision on the subpoena issues. The Court is as anxious as anyone not to delay resolution of the pretrial disputes, to the end that the trial itself may commence promptly. However, the Court has emphasized from the very outset that in its view the objective of the speediest possible resolution must give way to the protection of the constitutional rights of the defendant—a factor to which now must be added an appropriate concern for the constitutional prerogatives of the Chief Executive.

President Reagan will presumably wish to consider whether to invoke executive privilege with respect to the documents he will be ordered to produce. If no effort is made to narrow the subpoenas to the extent that this may legitimately be done, he will have to consider the privilege question with respect to many documents or excerpts from documents that might not in the course of events survive a "cut" under the requirements of Rule 17(c) itself—a somewhat wasteful and time-consuming process.[5]

On the other hand, by being able to concentrate on a possibly smaller number of documents following the narrowing of the subpoenas in accordance with the procedures announced herein, the former President or his counsel will be able to make their decisions regarding assertion or waiver of executive privilege that much more quickly. Naturally, in view of the Court's action to allow them to defer these decisions now, the Court expects them to proceed to make them expeditiously as soon as they are called upon to do so. To the same end, the Court also expects counsel for the former and the sitting President to marshal their legal arguments on the executive privilege issue in advance of the deadlines the Court is setting herein.

## C. *Precedents*

Defendant finally argues on this issue that the two-stage approach advocated by the former and the incumbent President, and its corollary, special scrutiny to ensure compliance with Rule 17(c) standards, find no specific sanction in the decided cases. Both in the *Aaron Burr*[6] and the *Nixon*[7] cases, upon which the former and the incumbent President primarily rely, executive privilege had been formally claimed by the time the respective courts made their decisions on the subpoenas, and to that extent defendant's observation is therefore correct. Technically neither of these decisions can be said to stand for the proposition that a subpoena to a President ought to be subjected to special scrutiny where there has been no actual assertion of executive privilege. However, in a broader sense the precedents sanction, indeed they call for, such an approach.

For one thing, there is language in these opinions that suggests this procedure. For example, in the *Nixon* case, the Supreme Court stated that "where a subpoena is directed to a President of the United States, appellate review, in deference to a coordinate branch of Government, should be particularly meticulous to ensure that the standards of Rule 17(c) have been correctly applied." 418 U.S. at 702, 94 S.Ct. at

5. Certainly, the Court is not prepared to hold that the former President waived his executive privilege for failure to assert it in the motion to quash filed on December 6, 1989.

6. *United States v. Burr,* 25 F.Cas. 187 (C.C.Va. 1807) (No. 14694).

7. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

3104.[8] To be sure, inasmuch as in that case executive privilege had been asserted, the Court's observation concerning Rule 17(c) may be regarded as dictum regarding its use here, where no such assertion has been made. However, this is Supreme Court dictum and therefore entitled to high respect from an inferior tribunal.

■ Beyond that, history and legal precedent teach that documents from a former or an incumbent President are presumptively privileged. *See United States v. Nixon,* 418 U.S. 683, 708–713, 94 S.Ct. 3090, 3107–10, 41 L.Ed.2d 1039 (1974). That is so for a variety of interrelated reasons. First, a request for documents in the possession of a President involves the exercise of jurisdiction over the presidency and accordingly implicates the possibility of a conflict between the branches. *Nixon v. Fitzgerald,* 457 U.S. 731, 754, 102 S.Ct. 2690, 2703, 73 L.Ed.2d 349 (1982); *United States v. Nixon, supra,* 418 U.S. at 703–04, 94 S.Ct. at 3105. Second, because of the dignity and stature of the presidency, a court must exercise deference and restraint when asked to issue coercive orders against a President with respect to his person or his papers. *Nixon v. Fitzgerald, supra,* 457 U.S. at 753, 102 S.Ct. at 2703; *United States v. Haldeman,* 559 F.2d 31, 76 (D.C.Cir.1976); *United States v. Burr,* 25 Fed.Cas. No. 14694, page 187, 192 (C.C. D.Va.1807). Third, executive privilege is fundamental to the operation of government, and it exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Nixon v. Administrator of General Services,* 433 U.S. at 449, 97 S.Ct. at 2793; *United States v.*

*Nixon,* 418 U.S. at 708, 94 S.Ct. at 3107. Fourth, the kinds of documents demanded by defendant in this case—the President's diary and his own notes—touch the core of the presidency as well as intimate and confidential communications by the President with himself.

## D. Clash of Legitimate Interests

■ None of this should be taken to mean that executive privilege is absolute. The Supreme Court has held that, absent special circumstances relating to sensitive national security secrets, the privilege is outweighed by the important constitutional and societal need for relevant evidence in criminal proceedings. *United States v. Nixon,* 418 U.S. at 707–08, 94 S.Ct. at 3107.[9]

·Since the defendant in this case was a trusted subordinate of President Reagan's, working in close proximity to him, and since the charges have a direct relationship to defendant's functions at the White House, the claim that the former President possesses documents that may shed light on these charges and on a possible defense thereto have considerable plausibility.

The Court is thus faced with a concrete setting for a decision on questions involving legitimate but conflicting constitutional rights and prerogatives. It is well settled that, faced with such a situation, a court has a duty not to resolve the constitutional questions unless this is actually necessary to the decision in the particular case, and that it should not formulate a rule of constitutional law broader than is required by the precise facts to which it is applied. As indicated, this doctrine was first announced

---

8. Similar language regarding the heightened scrutiny of subpoenas that implicate constitutional concerns is found in other opinions. *See, e.g., United States v. Haldeman,* 559 F.2d 31, 76 (D.C.Cir.1976) ("criminal rules governing evidentiary discovery and production to be meticulously observed"); *In re Grand Jury Subpoena: Subpoena Duces Tecum,* 829 F.2d 1291, 1300 (4th Cir.1987) ("even when the first amendment and fourth amendment problems raised by subpoenas duces tecum do not, in and of themselves, rise to the level of constitutional violations, the concerns that underlie those constitutional provisions must enter into the balancing of interests that is required by a motion to

quash under Fed.R.Crim.P. 17(c))"; *United States v. Cuthbertson,* 630 F.2d 139, 148 (3d Cir.1980) ("the district court should not be required to make the delicate balance of interests required by the [press] privilege [for unpublished information] unless the defendant first shows that he is unable to acquire the information from another source that does not enjoy the protection of the privilege").

9. The Memorandum submitted on behalf of President Reagan recognizes this principle, stating that "the Court has a heavy responsibility to the defendant and the protection of his constitutional rights." Memorandum at 2.

in Justice Brandeis' famous concurrence in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936), and it is now firmly embedded in the law. *See H.L. v. Matheson*, 450 U.S. 398, 407, 101 S.Ct. 1164, 1170, 67 L.Ed.2d 388 (1981); *Kremens v. Bartley*, 431 U.S. 119, 128, 97 S.Ct. 1709, 1714, 52 L.Ed.2d 184 (1976); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

A constitutional adjudication might be avoided in this case, or the breadth of the decision might at least be reduced, upon the happening of one of two contingencies, one under the Court's control, the other outside of it. First, President Reagan may decide to waive executive privilege. Before he makes a decision one way or the other in that respect, however, the former President is entitled to be apprised, within reason, of the factual setting and the documents to which his decision will relate. Second, the subpoena itself may be narrowed by the Court on the basis of the application of non-constitutional rules or doctrines, and the scope of the Court's decision and its impact on the rights of the Presidency may to that extent be minimized.

For these reasons, the Court has decided that it will follow the recommendation of President Reagan and the Department of Justice and deal at this time directly only with the scope of the subpoena, as distinguished from the doctrine of executive privilege.[10]

With these principles in mind, the Court will now explore two related issues: first, how the narrowing process is to be accomplished procedurally, and second, what sub-

stantive redactions may be effected in the subpoenas.

## III

### *Participation by the Reagan and Justice Department Counsel*

■ President Reagan and the Department of Justice strongly urge that they be furnished at this time the defendant's *ex parte* proffer of his defenses to the criminal charges as that proffer was submitted to the Court. This, it is said, will enable them to assist the Court in making the materiality decisions necessary to an appropriate narrowing of the subpoena.[11] President Reagan's counsel additionally propose that they be afforded the opportunity to contest defendant's proffer, as well as to make *in camera* submissions of their own with respect to that proffer.[12] The Department of Justice goes even further, advocating that after it has examined defendant's proffer of his defenses, it be empowered to prepare a response for the Court, apparently furnishing to the Court no more than a general description of the Reagan documents similar to those sometimes given to courts in Freedom of Information Act cases pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973). The Court rejects all these proposals.[13]

The basic issue before the Court at this time is one that courts are accustomed to considering in litigation of all kinds and in all phases—the materiality of evidence a party is seeking to discover or use. For that reason, the Court perceives no need for outside assistance "to ensure that the normal requirements of Rule 17(c) have

10. Procedures for the assertion of and decision on the privilege are discussed in Part VI, *infra.*

11. It is further suggested that the attorneys for the former and the incumbent President might also undertake the task of eliminating from the Reagan diary to be turned over to defendant entries that repeat material previously disclosed or that are cumulative as to other evidence. Department of Justice Memorandum at 16.

12. Memorandum at 17–19.

13. The Court also rejects the Department's suggestion that the assessment of whether the defendant needs the diaries be deferred until trial. As the Department recognizes, the interruption of the trial that this type of procedure would engender is precisely what Rule 17(c) was designed to avoid. Memorandum at 18. The Court does not intend to preside over this kind of intermittent or truncated trial unless this is absolutely necessary. It is the Court's judgment that this procedure is not necessary.

been satisfied." [14] Indeed, although the Court has agreed to apply special and somewhat stricter standards to the subpoena out of deference to the Presidency, it hardly follows that it could not, without assistance, cope with that refinement of the task.[15]

In any event, irrespective of that change in the standard, it would be going too far to accord to the attorneys for President Reagan and for the incumbent President— who, after all, are not disinterested parties but directly partisan in opposition to the accused in the dispute over the documents—a special role in the determination whether particular documents qualify under Rule 17(c), as written or as "modified." Such a transfer of the Court's responsibilities to entities having a direct interest in the outcome of the process would be unprecedented at this stage of a criminal case.[16]

Furthermore, these proposals, if implemented, would be injurious to the rights of the defendant. Consistent with his presumption of innocence, the defendant is not required, barring special circumstances, to reveal the nature of his defense in advance of the presentation of his evidence at the trial. Yet that is precisely what Poindexter would have to do if the Court accepted and implemented the Reagan–Justice proposals. And he would have to do so, moreover, at a time when the former and the incumbent President have not yet taken any measures of their own to focus the issues—not even by the assertion of executive privilege.

Should that privilege be asserted, the situation would change to a substantial degree. At that juncture, the presidential interests would become both more fixed and legally more significant, and on a balancing of the rights, interests, and obligations, the Court would be more justified in permitting direct participation of the kind envisaged by the former and the incumbent President. The purpose of the process would then be to lead to a decision on the scope of the subpoena in light of the values represented by the executive privilege, as distinguished merely from the Reagan–Justice objective of curtailing the scope of the subpoena.

As the Court has indicated in the introduction to this Opinion, while it is prepared to protect both the prerogatives of the presidency and the constitutional rights of the defendant, it will do so with an even hand. To that end, it will accommodate the interests of both in such a manner that, where in a particular phase of the litigation, the interests of one party appear to be more vital or more in need of protection than those of the other, it will adjust the procedures to provide that protection.

The short of it is that it would simply not be fair to require the defendant to inform President Reagan and the Department of Justice in detail of his defenses in advance of the trial, and to permit these parties to participate in parsing and curtailing them, at a time when they have not even committed themselves to the assertion or waiver of executive privilege. However, as indicated, once executive privilege is asserted—if it is—the balance of rights and obligations will necessarily change. In Part VI below, the Court establishes a procedure that will accommodate the various interests in light of such future developments.

## IV

### Narrowing of the Subpoenas

As indicated below, the Court has been able substantially to narrow the subpoenas

---

**14.** Reagan Memorandum at 18.

**15.** The kind of participation by President Reagan and the Department of Justice in the process that is being suggested is not even necessary from their own point of view. There can be no doubt that counsel for these parties are capable of discussing the issue of materiality without examining defendant's *ex parte* proffer. The Independent Counsel found no difficulty litigating relevancy pursuant to this Court's Order of September 11, 1989 without knowing the

details of Poindexter's defense as set forth in his *ex parte* proffer. Indeed, the Independent Counsel never even suggested that he was entitled to view that proffer or that he was incapable of litigating the discovery issues without it.

**16.** On that basis, the Department of Justice's request for the application of Freedom of Information Act standards and procedures—procedures designed for civil proceedings—is particularly inappropriate.

to eliminate demands that request documents defendant can obtain from other sources, that are unduly broad or oppressive, or that ask for documentary evidence that is clearly not material to the defense.[17]

## A. *Presidential Records*

■ The Presidential Records Act of 1978, 44 U.S.C. §§ 2201–07, divides the records of a President into two categories: (1) "Presidential records," created or received by the President or his staff in the course of conducting activities which relate to or have an effect on the duties of the President, 44 U.S.C. § 2201(2); and (2) "personal records," that is, materials of a private character, including diaries, journals, or personal notes, not prepared, utilized, or communicated in the transaction of government business. 44 U.S.C. § 2201(3). President Reagan asserts, without contradiction, that his Presidential records as defined in the statute have been delivered to the Archivist. That being so, no purpose would be served by enforcement of the subpoena to the former President insofar as it seeks his Presidential records. Moreover, the substantive description of the records being sought suggests that they are all "personal records," and on this basis, too, the request to President Reagan for "Presidential records" is inappropriate. For these reasons, insofar as the subpoena to President Reagan seeks his Presidential records, it is hereby quashed.[18]

## B. *Records in the Custody of the Archivist*

The Department of Justice claims that the Archivist has conducted several searches of the Presidential records of the Reagan White House, and that on the basis of these searches he has concluded that copies of all documents responsive to the subpoena issued to that official which are, in fact, in his possession have previously been provided to the Independent Counsel. The Independent Counsel, in turn, asserts that all documents produced to him by the Archivist that are relevant to this litigation have already been turned over to the defendant.

It does appear that the defendant disagrees with the Independent Counsel as to what documents are relevant, claiming that a broader standard of relevancy governs. However, according to a letter from a Justice Department attorney who represents the Archivist to the Independent Counsel's Office, the Archivist's determination of relevancy follows that established by this Court on September 11, 1989.[19] That, of course, ends the matter; and it follows that the Archivist has no additional documents to disclose. The subpoena to that official is therefore quashed in its entirety.

## C. *Part (b) of the Subpoena*

The subpoena to President Reagan is organized under three headings—(a), (b), and (c). These will now be considered.

The Court will also quash the demand for documents sought from President Reagan by Part (b) of the subpoena. It is not entirely clear what is being requested under that rubric. The former President assumes that this item seeks the same documents that are sought by Part (a) to the extent that they were not delivered to the Archivist at the conclusion of President Reagan's tenure. If that is a correct analysis of the request, it is redundant[20] and is denied on that basis.

Defendant, on the other hand, claims in a recent memorandum that Part (b) of the subpoena demands "other documentary materials" (that is, papers other than Presi-

---

**17.** As seen in subparts E and F *infra,* the Court rejects arguments for narrowing the subpoena in some other respects.

**18.** Where a subpoena is partially defective, it is the responsibility of the party issuing it to correct the errors, and not that of the responding party "to cull the good from the bad." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951).

**19.** Letter of December 5, 1989 from Thomas Millet to Frederick Robinson.

**20.** Unless they are for some reason exempt, President Reagan would have the obligation to produce these documents under Part (a) of the subpoena.

dent Reagan's diary, notes, and notebooks) which contain information on the 67 specific subjects detailed in Part (a).[21] Taken literally, this would mean that, in addition to having to search through his diary entries, notebooks, and personal notes (as demanded by Part (a)), the former President would also have to make a search of all the other records from his Presidency to attempt to locate documents that may relate to the 67 specific subpoena subjects and deliver them to defendant. Such a requirement would be both overly broad and oppressive, and subject to denial by the Court on that basis. On any view of the matter, then, Part (b) of the subpoena must be, and it is hereby quashed.

### D. *Answers to Interrogatories*

■ When a defendant requests the production pursuant to subpoena of documents possessed both by a President or a former President and also by some other entity, he is required first to attempt to secure the materials from the other entity before resorting to coercion against the President. That is so because as a general matter, Rule 17(c) requires a party seeking a subpoena to demonstrate that the materials "are not otherwise procurable," *United States v. Nixon*, 418 U.S. at 699, 94 S.Ct. at 3103; *United States v. LaRouche Campaign*, 841 F.2d 1176, 1179 (1st Cir.1988); *In re Grand Jury 87–3 Subpoena Duces Tecum*, 884 F.2d 772, 776 (4th Cir.1989), and because, as indicated above, the constitutional clash which would be precipitated by an invocation of executive privilege should be avoided if that may reasonably be done. *See Ashwander, supra,* and progeny. These principles may be applied here in several ways.

Part (c) of the subpoena to President Reagan seeks the answers to interrogatories he previously supplied to the Independent Counsel.[22] Defendant has requested these materials from the Independent Counsel, but that official has declined their production. The reason for the refusal is not entirely settled: some papers submitted to the Court argue that the material is subject to the prohibition on disclosure of Rule 6(e), Fed.R.Crim.P., as grand jury material, while others suggest that the Independent Counsel deems that the interrogatory answers are not *Brady* material [23] and therefore not discoverable by defendant.

To resolve the issue, the Court hereby requires the Independent Counsel to file a memorandum within ten days hereof explaining the basis for his refusal to make the answers available to the defendant; and defendant will thereafter have seven days within which to file a response.[24]

In any event, insofar as President Reagan is concerned, he need not produce these answers because they are available from another source. Part (c) of the subpoena to former President Reagan is accordingly quashed as unnecessarily burdensome.

### E. *Subpoena as a Substitute for Discovery*

President Reagan contends that the subpoena resembles and duplicates defendant's previous discovery requests. It is pointed out in amplification of that contention that the list of documents sought by the subpoena is similar in substance to defendant's discovery demands of May 23, 1988 and July 10, 1989. What that argument overlooks, however, is that with respect to many of the documents, defendant was informed that they could not be produced by the Independent Counsel but had to be made the subject of a subpoena to the former President. The Court will not subject the defendant to that kind of whipsaw. The argument for a denial of enforcement

---

**21.** Defendant's Memorandum at 7.

**22.** President Reagan apparently made those answers available also to Judge Gesell and to the grand jury.

**23.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**24.** The Independent Counsel has offered to turn the answers to the interrogatories over to the Court for *in camera* review, but he has not explained why the documents should not be made available to defendant.

of the subpoena with respect to some of the documentary material based on the alleged duplication of discovery requests is accordingly denied.

### F. *Lack of Specificity*

On a similar basis, relying upon decisions which condemn "fishing expeditions" and which require reasonable particularity, the former President contends next that the subpoena lacks adequate specificity. Defendant responds that, not having seen President Reagan's diaries and notes, it is impossible for him to be more specific. He goes on to contend that he has furnished sufficient circumstantial evidence upon which the Court would be justified to conclude that information relating to the categories listed in his subpoena is likely to be found in the former President's diary and notes.

The Court agrees in general with that assessment.[25] It will not place the defendant in the impossible position of having to provide exquisite specificity as a prerequisite to enforcement of the subpoena by the Court, while he is denied access to the documents in question, thus making it impossible for him to be more specific. At the same time, however, for the constitutional and privacy reasons alluded to above, the Court is not disposed to requiring President Reagan to make wholesale production of documents which ultimately may turn out to contain little or no material evidence.

The obvious answer to this dilemma, and one to which all the parties hereto have agreed as appropriate with varying degrees of enthusiasm, is an *in camera* examination by the Court of the relevant excerpts from the former President's diaries, notes, and notebooks to determine whether they contain specific evidence that should be produced.

Indeed, the legal and historical precedents indicate that in circumstances such as these a court should hold an *in camera* review of the Presidential papers at issue. *United States v. Nixon, supra,* 418 U.S. at 714, 94 S.Ct. at 3110; *Nixon v. Sirica, supra,* 487 F.2d at 719–20. Former President Reagan has already offered to submit to this Court the relevant portions of his diaries for such a review,[26] and the Independent Counsel has urged the Court to accept the offer.[27] Accordingly, President Reagan shall produce for the Court's *in camera* inspection the materials sought by the subpoena, as that subpoena has been narrowed herein,[28] by January 7, 1990.[29]

## V

### *Materiality of Specific Requests*

Part (a) of the subpoena to President Reagan requests the production of 67 categories of documents. Both the former President and the Department of Justice ask for the quashing of that, as of all other portions of the subpoena, but they have made no effort to discuss any of these categories specifically, much less in detail.[30] It is not clear, therefore, on what

---

**25.** With respect to some of the categories covered in Part (a) of the subpoena, defendant could perhaps furnish more illuminating descriptions, and he will have to do so at a subsequent stage of the proceedings, as discussed in Part VI, *infra.*

**26.** Reagan Memorandum at 34; Reagan Reply Memorandum at 19.

**27.** Independent Counsel Memorandum at 2. President Reagan has also made excerpts of his diaries available on various occasions and to various forums, and by doing so has somewhat diminished his interest in maintaining confidentiality. *See Nixon v. Sirica,* 487 F.2d 700, 718 (D.C.Cir.1973). The Court's order herein does not require significantly more than President Reagan already has provided to the Independent

Counsel, Reagan Exhibit B, the House and Senate Select Committees, Reagan Exhibit C, and Reagan Memorandum at 34. Furthermore, President Reagan has met with the Tower Commission and disclosed to it previously confidential communications with his advisers, and has directed numerous high level officials in his Administration to cooperate with the Iran-contra investigation. Defendant's Memorandum at 9 n. 8.

**28.** In lieu of the original documents, photocopies and typewritten transcripts may be so produced.

**29.** That is the date when the parties' briefing will be completed. *See infra.*

**30.** *Compare* note 15, *supra.*

basis the Court is to make the determination the former and the incumbent President expect of it. As indicated above, the Court intends to conduct an *in camera* review of the papers subpoenaed from President Reagan, to the extent that these papers have not been eliminated from production by the decisions made herein. That review is more likely to be productive if the interested parties provide the Court with specific objections to, or support for, the materiality to this case of the 67 individual categories of the subpoena, as distinguished from more general discussions of the law.

Rather than take the position that President Reagan and the Department of Justice have forfeited their opportunity to do so when their memoranda filed December 6 and 19, 1989 failed to include any arguments dealing with the specifics of the categories of documents sought by defendant, the Court will afford these parties an opportunity to do so now.

Accordingly, the former and the incumbent President may file memoranda addressed to the specifics of the lack of materiality, as they see it, of the 67 categories of documents in Part (a) of the subpoena to President Reagan, provided that such memoranda are filed within ten days hereof, that is, by December 31, 1989. The Independent Counsel may file a memorandum explaining his views, if any, by the same date. Defendant may respond within seven days, or by January 7, 1990. The Court will then promptly conduct its *in camera* review of the Reagan documents, with the assistance of the filings of the parties, and it will render a decision on the segments of the subpoena that will be quashed and the parts of the Reagan diary, notes, and notebooks that must be made available to defendant.

If at that juncture, President Reagan asserts executive privilege by way of a renewed motion to quash,[31] the Court will follow the procedure employed in the *Nixon* litigation and order that President Reagan and the Department of Justice on behalf of President George Bush be provided with copies of the Poindexter proffer of his defenses previously filed *ex parte* with the Court.[32] Defendant will have an opportunity to submit a response, and so will the Independent Counsel (although the latter will not be given access to defendant's *ex parte* proffer of his defenses). The Court will then make a final decision with respect to the enforcement of the subpoena.

## ORDER

On December 18, 1989, defendant requested permission to issue a subpoena *ad testificandum* for former President Reagan. Before making a decision, the Court expects to have full briefing on that request. Attorneys for the former President and for the incumbent President shall file their opposition or other response by December 31, 1989, the Independent Counsel may file a response by the same date, and defendant shall have until January 8, 1990 to file a reply.

## ORDER

A number of the pretrial proceedings (*e.g.*, discovery disputes, motions challenging various counts of the indictment, *Kastigar* issues) have been completed. However, several other disputed matters (*e.g.*, review of sensitive national security documents under CIPA, subpoenas for the documents of former President Reagan, subpoena for his personal testimony) are still being briefed by the parties. If the parties are to have the time needed for an adequate exposition of their views on these delicate and legally complex subjects, the

31. It is apparently not settled whether an incumbent President may assert executive privilege with respect to the records of a former President if the latter does not. However, *Nixon v. AGS, supra,* teaches that the views of a sitting President regarding a privilege claim of a former President is a factor to be considered by the court in evaluating such a claim.

32. President Reagan and the Department of Justice will of course be under a sealing order which will prohibit them, *inter alia,* from making the information available to the Independent Counsel, defendant's prosecutor.

current pretrial proceedings cannot be completed in time for the presently scheduled trial date. Accordingly, the Court has decided to postpone the trial by four weeks, from January 22, 1990 to February 20, 1990. The Court does not expect to defer the start of the trial beyond that date.