**UNITED STATES of America**

v.

**John M. POINDEXTER.**

**Cr. No. 88–0080–01 (HHG).**

United States District Court, District of Columbia.

Jan. 30, 1990.

See also 732 F.Supp. 142.

## OPINION AND ORDER

HAROLD H. GREENE, District Judge.

The issue before the Court is whether certain entries in former President Ronald Reagan's diaries are relevant and material to the issues involved in the instant criminal prosecution and should be ordered produced to defendant pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. After a careful review of the entries, the Court has concluded that the vast majority contain no information that is material to the issues in this case. As for those entries that do contain information of significance [1] meeting the standards established in the Court's December 21, 1989 Opinion,[2] the Court orders that copies be made available to defendant on an expeditious basis,[3] subject to a possible claim of executive privilege and to the Classified Information Procedures Act (CIPA).[4]

### I

### *Background*

On November 3, 1989, defendant moved under Rule 17(c), Fed.R.Crim.P., for a subpoena *duces tecum* requiring former President Reagan to produce diaries, notes, and other documents said to be material to Poindexter's defense to the criminal charges pending against him. At the Court's direction, defendant also submitted an *ex parte* proffer describing his contacts with President Reagan, as well as a second filing presenting in detail the grounds for his assertion that the documents sought are likely to contain information that would be material to the defense. On this basis, the Court authorized the issuance of the subpoena.

Lawrence E. Walsh, Independent Counsel, Dan K. Webb, Louise R. Radin, Associate Counsel, Christian (Chris) J. Mixter, Howard M. Pearl, Office of the Independent Counsel, Washington, D.C., for prosecution.

Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson and Michael G. McGovern, Fulbright & Jaworski, Washington, D.C., for defendant John M. Poindexter.

Theodore B. Olson, John A. Mintz, Michael B. Rappaport and Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, D.C., for former President Ronald W. Reagan.

David Anderson, James S. Reynolds, Thomas Millet and Douglas Letter, U.S. Dept. of Justice, Washington, D.C., for the U.S. and the Archivist of the U.S.

---

1. The action of the Court in ordering particular diary entries produced should not be taken as an indication that the Court has made a determination that defendant's underlying claim or theory is factually well founded. At the same time, the failure of alleged events to be recorded in the diary does not necessarily mean that these events did not occur; it means only that if they happened they were not recorded.

2. The Court's Opinion of December 21, 1989 summarizes the history of defendant's request for access to Mr. Reagan's papers, and it contains the Court's rulings on the law that governs demands for documents from a sitting or former President and on the procedures to be employed with respect to requests for their production. *United States v. Poindexter,* 727 F.Supp. 1501 (D.D.C.1989).

3. *See* p. 141, *infra.* The trial is scheduled to begin on February 20, 1990.

4. The Classified Information Procedures Act, 18 U.S.C.App. IV, sets up a procedure for dealing with classified materials in the context of criminal litigation.

The former President moved to quash the subpoena, but at the same time he offered to produce the documents to the Court for an *in camera* review to determine whether the documents were, in fact, relevant and subject to disclosure under Rule 17(c) and *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). On December 21, 1989, the Court accepted that proposal and ordered responsive documents to be produced. The Court also invited the parties to address the relevancy of the sixty-seven categories of information requested in the subpoena. These categories address a broad range of factual issues related to arms sales to Iran, the claimed diversion of the proceeds of those sales to the Contras, and various efforts by the Administration to aid the Contras.[5] The parties have now briefed the issues, and President Reagan has turned over to the Court copies of more than one hundred diary entries that, according to his counsel, are responsive to the subpoena.[6]

## II

### *Discussion*

The subject matter of the diary entries falls into three broad categories, which the Court considers below.

---

**5.** Many of the items in the subpoena seek classified and highly sensitive information. To ensure that this Opinion may be made public, the Court will not discuss specifics of classified projects and information.

**6.** In an affidavit to the Court, counsel for President Reagan asserts that while Mr. Reagan is turning over all responsive diary excerpts, he does not have possession of any note cards, personal notes, or other documents mentioned in the subpoena. The affidavit also states that the President's diaries do not contain anything responsive to the following subpoena items: 1–11, 14–25, 28, 30–32, 35, 37, 39–41, 43–46, 47–53, 55, 58–60, and 62–65.

**7.** This category is comprised of Items 12, 13, 54, 56, 57, 60, 61, 66, and 67.

**8.** In its September 11, 1989 Opinion, 727 F.Supp. 1470, dealing with discovery issues, the Court noted that:

First, documents indicating that United States officials ... knew of the activities of this defendant and those of Oliver North, might

### 1. *President Reagan's Knowledge of Iran-contra.*

Several of the requests for documents relate to diary entries which discuss the issue of President Reagan's knowledge, or the lack of knowledge, of various aspects of the arms sales to Iran, the alleged diversion of the proceeds of those sales to the Contras, other efforts by the National Security Council staff to assist the Contras, and other aspects of what has been called the Iran-contra affair.[7] Defendant asserts that the President knew of and approved these activities, and that this knowledge and authorization will support the defense contention that Poindexter had no reason to conceal these activities from Congress.

This Court previously determined that defendant is entitled to make this argument, and that as a general matter he may be entitled to documents supporting such a claim.[8] Upon its review of the Reagan diary excerpts, the Court has concluded that some, but not all, the diary entries produced in response to the various subpoena categories are relevant to defendant's claim.

■ A diary entry furnished to the Court by the former President in response

---

provide support for defendant's assertion that he did not attempt to conceal the NSC's activities. Furthermore, such documents might support his claim that he had no motive to conceal these activities since they were already widely known. Finally, proof that the activities were widely known by many in the government could help defendant claim that he reasonably believed them to be legal.

*Id.* at 1477. The Court then observed that "[t]hese conclusions apply with equal force to documents, if any, regarding knowledge of or participation in the NSC's Iran-contra activities by former President Reagan...." *Id.* at 1477.

Documents evidencing Presidential authorization, if any, of these activities would also be material to support Poindexter's claim that he reasonably believed the NSC's activities to be legal and that he therefore had no motive to conspire to lie about them.

*Id.* Moreover, both the Independent Counsel and counsel for the former President acknowledged at the January 23, 1990 hearing on the subpoena *ad testificandum* for former President Reagan that defendant would be entitled to material showing Presidential authorization of the activities charged in the indictment.

to Item 12 of the subpoena reports on a "successful" trip Poindexter took in December 1985 to Central America;[9] diary excerpts in response to Item 54 report on meetings during the same month with various high officials, including Poindexter, to discuss the sales of arms to Iran; and Item 60 addresses briefly the issue of the proceeds from these sales. All these shall be furnished to defendant for the reasons described *supra*.

■ In response to Item 66, President Reagan has produced numerous diary entries which fall generally into three groups: the first relates to the former President's knowledge of the arms sales to Iran;[10] the second reflects his concern for the American hostages in Iran and his contact with their families; and the third has to do with conversations between the President and individuals, both inside and outside of government, produced in response to the assertion that these conversations related to the diversion to the Contras of the proceeds from arms sales to Iran.

For the reasons discussed above, defendant is entitled to the entries in the first group, and accordingly the entries dated July 17 and 18, 1985; August 23, 1985; September 14–15, and 16, 1985; November 22 and 23, 1985; December 5, 7, 9, and 10, 1985; February 28, 1986; April 18, 1986; May 26, 27, and 28, 1986; July 26–27, 1986; November 7, 8–9, 10, 12, 13, 25, 28, and 30, 1986; and December 2, 1986 in Item 66 must be disclosed to defendant.[11]

However, defendant is not entitled to any of the entries in the second and third groups under Item 66. He has proffered no theory to the Court that would entitle him to diary excerpts or entries reflecting the former President's concern for the hostages or his contacts with their families. As for the entries in the third group, all of them are too general and non-specific to qualify for disclosure; none of them sheds any light on the question of what President Reagan may have known about the diversion.

■ Thus, in response to Item 13 of the subpoena, the former President has provided a diary entry regarding a conversation he had with William Casey, former Director of the Central Intelligence Agency. Defendant asserts that the conversation related to "NSC activities in support of the Contras,"[12] and that the former President's knowledge of these activities would help to show that he knew of and authorized activities of the NSC staff in support of military and paramilitary activities of the Contras.[13] After examining the diary entry, the Court concludes that it contains nothing to indicate or even suggest that the conversation related to activities by the NSC staff in support of the Contras' military or paramilitary operations.[14]

■ In Item 57, defendant seeks information regarding a finding President Reagan signed on January 17, 1986, and a briefing Poindexter gave to him on that date. Defendant asserts that diary material on these events might help to establish

---

**9.** The entry includes a somewhat ambiguous comment arguably indicating that the former President knew of defendant's activities on behalf of the Contras.

**10.** Defendant asserts in this connection that the former President knew about the activities of General Secord and others with respect to the arms sales.

**11.** The December 1, 1986 entry is identical to an entry produced to the Court in response to Item 67 of the subpoena. Defendant is not entitled to that entry for the reasons discussed in connection with Item 67, *i.e.*, the material does not support defendant's theories regarding President Reagan's knowledge. Item 61 is a copy of the May 27 and 28, 1986 entries under Item 66;

Item 61 accordingly need not be separately produced.

**12.** Defendant's Memorandum at 14.

**13.** Defendant's explanation of his need for the item rests on a memorandum in which Casey wrote that he once discussed a "special NSC program" with President Reagan. Nothing in this memorandum, as quoted by defendant, indicates that the program discussed military or paramilitary activities, or, indeed, that it even related to the Contras.

**14.** Only support for the military and paramilitary activities of the Contras was prohibited by the Boland Amendment—a focus of the indictment here.

that he told the President about the use of intermediaries in the Iran Initiative. In response, President Reagan produced a two-sentence diary entry, which makes no mention of a conversation regarding the use of intermediaries. Similarly, in his request for Item 61, defendant asserts that the subpoenaed material might confirm the existence of a conversation between himself and the President regarding General Secord's role in the arms sales to Iran. However, the diary entries produced by President Reagan in response to this request do not record such a conversation, or Secord, or the possible use of intermediaries in the arms sales. Defendant is therefore not entitled to the material produced in response to Items 57 and 61 of the subpoena.

■ In response to Item 67 of the subpoena, President Reagan has produced several entries on discussions in the wake of the fact-finding inquiry conducted by then-Attorney General Meese regarding the dispositions of the proceeds from the arms sales, including the Poindexter and North involvements. Upon its examination of these entries, the Court has concluded that they contain no information to sustain defendant's contention that President Reagan knew of and authorized the diversion or other NSC activities in support of Contra military operations. Accordingly, the entries need not be made available to the defendant.[15]

2. *Efforts to Win Foreign Support for the contras.*

■ A large number of diary entries the Court has examined relate to President Reagan's efforts to persuade third countries to aid the Contras. Defendant asserts that these efforts were an aspect of a quid pro quo program in which the Reagan Administration offered to grant United States military or economic assistance to these countries in exchange for aid in support of the military and paramilitary activities of the Contras. Defendant argues that knowledge of and participation by President Reagan in such a program would sup-port the defense assertion that such assistance was either approved of, or was valid under the Boland Amendment, and that this would, in turn, support his contention that he had no reason to conceal the activities with which he is charged in the indictment which also relate to military aid to the Contras.

Most of the diary entries in this category do not discuss or in any other way support the notion of a quid pro quo. Some of the entries refer only to statements of support for the Contras by foreign dignitaries. These statements are too general and unspecific to shed light on the President's knowledge of, or involvement in, any quid pro quo program, let alone a program for military assistance.

A small number of entries discuss specific actions certain foreign leaders agreed to undertake to aid the Contras. However, here again, the entries do not indicate or even suggest that the aid was intended to, or would, in fact, support Contra military or paramilitary operations. Defendant's arguments regarding the relevancy of foreign assistance for the military and paramilitary operations of the Contras are therefore inapplicable.

A few of the diary entries are in a different category. Diary entries dated April 25 and 26, 1985, and produced in response to Item 29 of the subpoena, describe President Reagan's apparently successful effort to persuade a Central American government to release to the Contras a shipment of arms that had been seized by the military of that nation. For the reasons explained above, defendant is entitled to these entries and will be given access thereto.

Similarly, the diary entries responsive to Items 27 and 33 of the subpoena address United States military-type assistance to a Central American nation arguably in support of the military activities of the Contras or in opposition to their opponents. Defendant is likewise entitled to these entries, since they may show what types of aid President Reagan thought could legally

15. Defendant has withdrawn Item 56, which sought material relating to a NSC meeting.

be provided for the military or paramilitary operations of the Contras.[16]

In his response to Item 46 of the subpoena, President Reagan produced a brief entry regarding a certain top-secret and extremely sensitive activity of the United States government. After reviewing the entry, the Court has concluded that the activity in question does not relate to any of the activities described in the indictment, and that it is therefore not relevant to the instant case.

### 3. *Efforts to Win Domestic Support for the Contras.*

■ A substantial number of entries deal with President Reagan's efforts to win domestic support for the Contras. The overwhelming majority of these entries address the President's efforts to persuade the Congress on this subject. Obviously, these entries are not relevant to the issues in this case, for defendant cannot, and does not, argue that the Administration's efforts to garner congressional support for the Contras led him to believe that the activities described in the indictment were legal.

A smaller number of the entries discuss meetings with, and speeches to, members of the public. All of these entries are both brief and general. The primary topic is almost invariably the occurrence of the meetings themselves; the subject matter under discussion is addressed only in the most cursory and non-revealing fashion. The entries do not record in any way that President Reagan urged citizens to provide direct support of any kind to the Contras, or that the President or anyone else present at the meetings raised the subject of the provision of such aid by members of the public.

Although the entries indicate that the President may have known that some private citizens had contributed funds to the Contras, there is no mention of any Presidential knowledge of specifics. Finally, nothing in any of the entries suggests that the President provided anything more than a policy-type speech, as distinguished from any specific request. The Court concludes that this is not a sufficient basis for a disclosure of the entries to the defendant.

### III

### *Conclusion*

President Reagan shall turn over to defendant not later than February 5, 1990, copies of all diary entries produced in response to Items 12, 27, 29, 33, 54, and 60 of the subpoena, as well as the following entries produced in response to Item 66: July 17 and 18, 1985; August 23, 1985; September 14–15, and 16, 1985; November 22 and 23, 1985; December 5, 7, 9, and 10, 1985; February 28, 1986; April 18, 1986; May 26, 27, and 28, 1986; July 26–27, 1986; November 7, 8–9, 10, 12, 13, 25, 28, and 30, 1986; and December 2, 1986.

If at or prior to the deadline specified above, the former President asserts the doctrine of executive privilege as a method of opposing the disclosure of these diary entries, or any of them, the Court will follow the procedures employed in *United States v. Nixon, supra,* and explained in the Opinion of December 21, 1989.[17] The remainder of the subpoena is quashed.

---

16. As discussed above, this may support defendant's assertion that he believed the Iran-contra diversion to be legal, and that he therefore lacked a reason to make false statements to the Congress with reference thereto.

17. At that juncture, the Court would revisit the issue of the materiality of the documents. The former President and the Department of Justice, on behalf of President George Bush, would then be provided with copies of the Poindexter prof-

fer of his defenses previously filed *ex parte* with the Court. *See* December 21, 1989 Opinion, 727 F.Supp. at 1511. President Reagan and the Justice Department would thereafter be given the opportunity to address the materiality of the subpoenaed documents to those defenses and the effect of the application of executive privilege with respect to those documents. Defendant would have an opportunity to respond, as would the Independent Counsel. The Court

would thereafter make a final decision with respect to enforcement of the subpoena.