UNITED STATES of America,
Plaintiff–Appellee,

v.

Victor ARDITTI, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Guillermo AVILA, Defendant–Appellant.

Nos. 90–8646, 90–8721.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1992.

Bernard J. Panetta, II, Mary Stillinger, Cabellero, Panetta & Ortega, El Paso, Tex., for defendant-appellant in No. 90–8646.

LeRoy M. Jahn, Richard L. Durbin, Jr., W. Ray Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee in No. 8646.

Sidney Powell, Strusburger & Price, Dallas, Tex., for defendant-appellant in No. 90–8721.

LeRoy Morgan Jahn, Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee in No. 90–8721.

Before GOLDBERG, SMITH, and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Guillermo Avila and Victor Arditti were convicted of conspiracy to launder monetary instruments and of the substantive offense. Avila argues that his conduct did not violate the federal monetary instrument laundering statute, that the jury instructions at his trial were inadequate, and that the government entrapped him and engaged in outrageous conduct in the course of its undercover operation. Arditti also challenges the jury instructions and charges entrapment and outrageous conduct, and he claims that in quashing a trial subpoena the district court deprived him of due process. We affirm.

## I.

These appeals arise from an Internal Revenue Service ("IRS") undercover investigation of money-laundering. The defendants were tried separately, but their cases were consolidated on appeal. Because each defendant challenges the conduct of the IRS investigation, we present the facts of the two cases together. We then discuss Avila's argument that his conduct did not violate the statute, each defendant's challenges to the jury instructions, the issues of entrapment and outrageous government conduct as they apply to each, and the quashing of Arditti's subpoena.

## II.

In 1988, IRS Special Agent Gary Gallman began investigating money laundering in El Paso, Texas, using the assumed name of "Gary W. Adams" and portraying himself as a cocaine dealer. Gallman started with information that Gabriel Yanez, who owned a money exchange business, laundered money by handling it to disguise its source. Gallman's goal was to discover Yanez's methods and cohorts.

Gallman first contacted Yanez in May 1988, explaining that he wanted Yanez to help him move large amounts of cash offshore, then bring the money back into the United States in usable form, intimating that he and his associates were involved in illegal activity. Gallman and Yanez invented the name "Ricardo Guerra–Battle" and established a Mexican bank account in that name. Yanez twice funneled $100,000 cash through Mexico, arranged for the money to

be wire-transferred to Gallman's bank in Dallas, then collected a fee from Gallman.

Yanez next arranged for Gallman to open a Cayman Islands account in the "Adams" and "Guerra" names, using a letter of introduction from an El Paso attorney to a Cayman Islands attorney. Gallman later asked Yanez to put him in touch with someone who could help him with business in El Paso. In September, Yanez introduced Gallman to Arditti, an El Paso criminal defense lawyer.

During the introductory meeting in September 1988, Gallman told Arditti that he must trust Arditti before he could reveal the nature of his business and explained that Yanez was helping him "get [his money] out and get it back" so that he could use it. Arditti reassured Gallman by mentioning the attorney-client privilege, his previous work with clients involved in drugs, and his distrustful nature.

Arditti told Gallman that since he was "into that kind of business," he should fund a war chest in preparation for the day he would need money to get out of jail on bond and hire a lawyer. Gallman explained that he couldn't spend any of the money "the way it is right now and that he had "to get it out and get it back." Although Arditti told Gallman that he could not advise him on how to launder any illegal funds, Arditti advised Gallman on structuring transactions to purchase real estate in El Paso without arousing suspicion and assured Gallman that the government would not discover any payments made by Gallman to Arditti.

In October, Yanez channeled another $100,000 of Gallman's cash to Gallman's Dallas account after tinkering with the Cayman Islands arrangements. In the meeting discussing the transfer, Gallman told Yanez directly that "he and his group were in the 'coke business' and his part was to handle the money they derived from the sales." Yanez and Gallman seemed to agree that they should follow Arditti's advice in investing in real estate and stocks

by using Mexican cashier's checks, using the "Guerra" false name, and making purchases in the name of the British Virgin Islands corporation they had opened to facilitate the offshore Cayman Islands account. Gallman asked Yanez to recommend stock or brokerage houses that the corporation could use to invest in the stock market.

In November,[1] Yanez told Gallman about his friend Avila, a securities broker in San Antonio for the firm of Prudential–Bache Securities ("Pru–Bache") who wouldn't insist on meeting Gallman "or anything like that." Yanez explained that he frequently referred business to Avila and that the two had a fee-sharing arrangement. When Gallman asked what Yanez had told Avila about him, Yanez said that he portrayed Gallman as a Mexican mining client seeking investments. When Gallman further questioned Yanez about Avila, Yanez said that "he has a lot of clients from Mexico in the same business you are, and he never asks questions." During this discussion, Gallman signed the brokerage forms provided by Yanez as "Guerra."

Yanez introduced Gallman and Avila in January 1989 at a hotel in San Antonio. Although Gallman used his undercover name, "Adams," he signed the client agreement and certificate of foreign status (W–8) as "Guerra." The W–8 eliminates brokerage house reporting requirements as to the accounts of foreign nationals and, thus, effectively would have prevented the government from knowing that Ricardo Guerra or Gary Adams was transacting business with Pru–Bache. Gallman told Avila that Gallman was both "Adams" and "Guerra" and that this was "untaxed money" from the Mexican mining operation. Additionally, according to the government, Avila knew that Gallman was not a Mexican citizen, yet told Gallman that he would "take whatever you tell me" when asked whether he felt comfortable about the Mexican mining investor story. Further, Avila told Gallman that because client "confiden-

---

**1.** The district court instructed the jury that it could not consider any acts prior to November 18, 1988, the effective date of 18 U.S.C. § 1956(a)(3), relating to the charge of conspiracy to violate the statute.

tiality is a must," he staggered client appointments and entertained at home.

The three arranged for investment funds to come from Gallman through Yanez to Avila. Avila repeated that under law and Pru–Bache policy he could not take cash and that investments of under $10,000 did not need to be reported to the government. In February, Gallman executed new, backdated documents to change the brokerage account to the name of the British Virgin Islands corporation at Avila's request. As with the first forms, Gallman signed the forms in blank, and Avila completed them.

A few days later in February, Gallman and Avila met again. Gallman plainly told Avila, "I am in the coke business. That's what I do. Now, you will not ever be involved in that part of it." Although Gallman offered Avila the opportunity to back away from the deals because of the source of the funds, Avila responded that Yanez had told him that, as long as Gallman provided the investment funds in check form, there was "[n]o problem as to where that money comes f[rom] or how it was made," because the corporation, not "Adams," was Avila's client. Avila asked Gallman whether he was a law enforcement officer, which Gallman denied.

Gallman purported to have recently collected $15,000, which, the government asserts, Avila admittedly understood were the proceeds from a cocaine deal. Avila, however, maintains that Gallman did not tell Avila that he wanted to violate the law or that he did not want to report the cash. Avila stresses that he told Gallman that he did not want to do anything illegal and that Gallman confirmed that the corporation was "legal" and that Gallman was going to deposit "clean money."

After Avila repeated that he could not handle cash, he directed Gallman to obtain cashier's checks in the name of the corporation and told him how to do so. After Gallman obtained the checks, he met Avila outside Avila's office and gave him two cashier's checks totaling $15,000, payable to Pru–Bache in care of Avila. Avila deposited the funds in the corporation's account. In March, Gallman delivered to Avila a $40,000 cashier's check, which Avila also deposited.

At Gallman's request, Yanez invited Arditti to meet them for lunch in March 1989. Arditti discussed methods to avoid suspicion and the tracing of money, including not using cash. Gallman offered Arditti the chance to "walk away from the deal" if Arditti had a "problem with the money or what I do." According to Gallman's testimony, when Arditti responded that he had not asked what kind of business Gallman did, Gallman then clarified, "You understand this is coke money," to which Arditti replied, "You don't see me going anywhere, do you?" Arditti disputes Gallman's testimony as to this portion of their conversation and notes that the government failed to tape-record this exchange, nor did Gallman record it in his memorandum concerning the meeting.

In May, Gallman met with Yanez and Arditti. Gallman put aside the idea of real estate investments in El Paso and told Yanez and Arditti about an opportunity to invest $200,000 in an Oklahoma oil deal. Gallman revealed that "this money we're doing right now is part of a ten-kilo deal that ... I'm getting paid off for ... now," and stressed protecting his identity in the oil deal. Arditti outlined a complex arrangement for preventing governmental access to Gallman's name through the royalty payment mechanism, perhaps setting up a foreign corporation or, as Gallman suggested, a trust in a foreign bank to receive and invest Gallman's money. Gallman repeated that "this is coke money" and wanted to know whether he could count on Arditti not to talk if "I end up ... getting busted."

Arditti assured Gallman that he would not divulge anything but again warned Gallman against spending large lumps of cash. Arditti agreed to draft documents memorializing the "loan" of money from the corporation to Gallman, which would explain the source of Gallman's money, and to check on establishing an escrow account to receive Gallman's money and invest it in the Oklahoma deal.

The next week, Yanez told Gallman that the fake loan documents and the escrow account would be delayed because Arditti was being audited by the IRS. Arditti told Yanez he was worried about "being framed" by Gallman. When Yanez passed this information to Gallman and offered to contact another lawyer, Gallman insisted on using Arditti.

At the end of May, Gallman delivered $50,000, which Yanez funneled to Gallman's Dallas account. At this time, Yanez attributed Arditti's delay to procrastination but noted that Arditti was "convinced" about how to proceed with the bank in setting up the escrow account. Gallman repeatedly telephoned Yanez over the next few weeks because Gallman wanted Arditti to complete the deal. Yanez continued to insist that Arditti would participate but wanted to take care in structuring the deal.[2]

The first infusion of funds to Oklahoma occurred through Yanez's own bank account at the end of June, not through the escrow account as envisioned by Gallman. Gallman asked for Yanez's help in getting the money to Oklahoma using the escrow account procedure. In mid-July, Gallman met in El Paso with Yanez and Arditti, who explained that they had agreed to the method used in the first transfer because the bank had set up some hurdles in establishing the escrow account. Departing from the escrow account idea, Arditti offered to set up a trust whose funds Arditti would manage, which would also conceal Gallman's identity. The three formulated an elaborate plan to invest money from the corporate brokerage account into the Oklahoma oil deal and completed the arrangements for the fraudulent loan.

With Yanez's participation, Arditti opened a bank account in the name "V.R. Arditti Trust Account Number 3" several days later. No trust documents were prepared for the account, and Arditti alone had signature authority and the code to validate wire transfers. When Arditti received a check from the corporate brokerage account for $50,000 on August 2, he deposited it in the trust account and told the bank to wire $49,000 to the oil deal bank account in Oklahoma.

In mid-August, Arditti gave Gallman a bill for his services. Gallman found the amount "pretty stout," so Arditti adjusted it downward but asked Gallman not to pay him in cash because that would appear suspicious. The three then devised a more efficient plan for future transactions, focusing on the need to shield Gallman by using the "Guerra" name and procuring the funds for deposit in the trust account at a Mexican bank in the form of a cashier's check.

As planned, Arditti received a $50,000 check the next day from a Mexican money exchanger and transferred the money to the oil deal account. On August 29, Arditti, following the same procedure, deposited another $50,000 in the trust account and wired it to Oklahoma.

### III.

A grand jury charged Arditti with conspiring with Yanez and Avila in violation of 18 U.S.C. § 371 to (1) avoid filing currency transaction reports in violation of 31 U.S.C. § 5313(a); (2) avoid filing currency or monetary instrument reports in violation of id. § 5316; and (3) launder a monetary instrument in violation of 18 U.S.C. § 1956 (count one). Additionally, the indictment charged Arditti with violating section 1956(a)(3) (counts twelve, fifteen, and eighteen) and violating id. § 2 by aiding and abetting Yanez in violating section 1956(a)(3) (counts fourteen and sixteen). The jury convicted Arditti on all counts.

The indictment charged Avila with conspiring with Arditti and Yanez in violation of section 371 to commit the three offenses

---

**2.** To buttress his claims of entrapment and outrageous government conduct, Arditti has pointed out several facts regarding the contacts between Yanez and Arditti after the May transaction, specifically: (1) Yanez told Gallman that he contacted Arditti or visited his office every day; (2) Arditti seemed so reluctant to do Gallman's work that Yanez suggested hiring another lawyer to complete Gallman's work; and (3) Gallman contacted Yanez three times on May 30 and 13 times in June to ask about Arditti.

outlined above (count one). Additionally, the indictment charged Avila with violating section 1956(a)(3) (counts seven and eight). The district court granted Avila's motion to sever his case for trial.

The court granted Avila's motion for judgment of acquittal on the allegations in count one that Avila conspired to violate sections 5313(a) and 5316. The jury, however, convicted Avila on the remaining allegation in count one and on counts seven and eight.

### IV.

Avila challenges his substantive and conspiracy convictions on the ground that his conduct did not violate a criminal statute. Section 1956(a)(3), entitled "Laundering of Monetary Instruments," makes it unlawful for a person, with the intent

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law,

[to] conduct[ ] or attempt[ ] to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity....

18 U.S.C. § 1956(a)(3) (West Supp.1988).[3] Section 1956(c)(4) defines "financial transaction" as

(A) a transaction (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

Section 1956(c)(5) defines "monetary instruments" as follows:

The term "monetary instruments" means (i) coin or currency . . ., travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery.

Avila urges reversal of his conviction under section 1956(a)(3) because the plain terms of the statute do not criminalize accepting cashier's checks in non-bearer form. Avila argues, as he did in a motion for acquittal, that a cashier's check is not a "bank check" under the relevant definition of "monetary instrument." Avila asserts that Congress did not intend to cover cashier's checks not in bearer form, as evidenced by a federal statute and multiple federal regulations that plainly acknowledge the distinction between a "bank check," i.e., a check drawn by a bank on its account in another bank, and a "cashier's check," i.e., a check drawn by a bank on itself and accepted upon issuance. *See, e.g., Bruno v. Collective Fed. Sav. & Loan Ass'n,* 147 N.J.Super. 115, 370 A.2d 874, 877 n. 2 (1977).

The government agrees with Avila's characterization of the cashier's checks as non-bearer instruments and accepts Avila's distinctions between cashier's checks and bank checks. Pointing to the legislative history of section 1956, however, the government argues that Congress indeed intended the definition of the term "monetary instruments" to include cashier's checks. "Monetary instruments are a subset of the term 'property' as used in section (a), a term that is intended to be construed liberally to encompass any form of tangible or intangible assets." S.Rep. No. 433, 99th Cong., 2d Sess. 13 (1986).

Avila responds that the legislative history contextually refers to cashier's checks "in such form that title thereto passes upon delivery," not to all cashier's checks. *Id.* Moreover, Avila asserts that Congress's in-

---

**3.** All references herein are to the 1988 version of § 1956. Congress subsequently amended the statute, but altered only one of the provisions

relevant here, § 1956(c)(5) (clarifying, not enacting substantive changes to, definition of "monetary instruments").

tent is irrelevant when a statute, like this one, is not capable of two rational readings. *Cf. McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) ("before one can be punished, it must be shown that his case is plainly within the statute") (citation omitted).

 Despite the facts that Congress did not include cashier's checks in the statutory definition of monetary instruments and that we must construe criminal statutes strictly, *see United States v. Daniel,* 813 F.2d 661, 663 (5th Cir.1987), Avila's challenge to his substantive convictions must fail. Simply, the plain language of section 1956 does not require that the suspect have used a "monetary instrument" in his offense. A financial transaction for the purposes of the statute is "[1] a transaction involving the movement of funds by wire or other means *or* [2] involving ... monetary instruments ... *or* [3] involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree" (emphasis added). The substantive charges of his indictment, counts seven and eight, do not accuse Avila of laundering a "monetary instrument" as defined in section 1956(c)(5). Rather, count seven states that he conducted "a financial transaction involving property to wit: $15,000 in cashier's checks, represented by a law enforcement officer to be the proceeds of [specified] ... unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)." Count eight is similar, except that it specifies $40,000 as the sum in question and does not mention cashier's checks.

The acts alleged in these counts plainly fall within the language of section 1956(c)(4)(A)(i): They were transactions "involving the movement of funds by wire or other means." The issue of whether cashier's checks are monetary instruments thus is irrelevant to the substantive counts; the checks unquestionably were "property" and "funds [moved] by wire or other means" under the statute.

Although we have not previously interpreted the money laundering statute in this way, the plain language dictates such a holding, and this court has found that the statute encompasses a wide range of conduct. *See, e.g., United States v. Gallo,* 927 F.2d 815, 822 (5th Cir.1991) (transporting money in the trunk of a car was a financial transaction in that it was a "movement of funds by wire or other means ... which in any way or degree affects interstate of [sic] foreign commerce" (ellipses in original)).

 We similarly uphold Avila's conspiracy conviction. The first count of the indictment charged that Yanez, Arditti, and Avila "willfully, knowingly and unlawfully conspired, combined, confederated and agreed together, and with each other, and with others to the Grand Jury unknown, ... to launder a monetary instrument, in violation of Title 18, U.S.C. § 1956. Arditti does not raise the issue on appeal, but Avila appears to argue that this count of the indictment charges a crime that the government did not prove. Simply, Avila asserts that he did not conspire to launder a "monetary instrument" under the language of the statute. If there was conspiracy, Avila argues, it was to launder cashier's checks, which are not monetary instruments as statutorily defined.

As with the substantive counts, this court need not consider whether cashier's checks qualify as monetary instruments. Although cashier's checks were the means through which the conspirators were to launder the funds, the objective of the conspiracy was to launder the cash that "Adams" claimed to have obtained through his drug wholesaling activities. Cash, of course, is "coin or currency of the United States" and thus is a monetary instrument. Because Gallman represented to Avila that he wanted to launder cash, and Avila advised him how to convert the cash into cashier's checks without having to present his identification, so that Pru–Bache could accept the money, we reject Avila's argument that no monetary instruments were involved.

**V.**

 Avila further argues that his behavior was not illegal because the government

agent did not represent to him that the funds he participated in laundering were the proceeds of criminal activity. Section 1956(a)(3), in establishing the basis for money laundering "sting" operations, requires that the government agent represent that the property involved in the transaction is the "proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity." The statute further defines the term "represented" as "any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section." 18 U.S.C. § 1956(a)(3).

Avila argues that "[s]trict construction … requires that the officer make an affirmative representation to the defendant," not merely a suggestion, or just enough information to create an inference. Nor can the government agent's perception of the "representation" substitute for satisfaction of the element. Because Gallman did not plainly tell Avila that the $15,000 and $40,000 cashier's checks were proceeds from cocaine sales, Avila urges reversal of the convictions.

We find Avila's arguments unconvincing. The record shows that "Adams" told Avila that he was in the cocaine business and that the initial $15,000 was the proceeds of a collection. Because "Adams" represented his business as drug wholesaling, then never represented his relationship with Avila as one involving funds not derived from that illicit industry, the jury could have viewed the later $40,000 as ostensible drug-related funds, believe that Gallman portrays and Avila viewed them as such, and thus convict Avila of money laundering.

To hold that a government agent must recite the alleged illegal source of each set of property at the time he attempts to transfer it in a "sting" operation would make enforcement of the statute extremely and unnecessarily difficult; "legitimate criminals," whom undercover agents must imitate, undoubtedly would not make such recitations before each transaction. In this case, it is enough that sufficient evidence was presented that the jury could have found beyond a reasonable doubt that "Adams" represented, and Avila understood, that the funds they were laundering were the proceeds of the specified illegal activities.

## VI.

Avila and Arditti challenge the district court's jury instructions at their respective trials. We find their argument to be without merit.

■ A district court possesses broad discretion in framing the instructions to the jury; we will not reverse unless the instructions taken as a whole do not "correctly reflect the issues and law." *United States v. Casto*, 889 F.2d 562, 566 (5th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990) (citation omitted). This court will reverse for abuse of discretion a district court's refusal to issue a jury instruction only if the requested instruction "(1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that failure to give it seriously impairs the defendant's ability to effectively present a given defense." *United States v. Chambers*, 922 F.2d 228, 241 (5th Cir. 1991) (citation omitted).

■ The district court defined the offense of conspiracy (count one) in relevant part as follows, essentially tracking the *Fifth Circuit Pattern Jury Instructions* § 2.21 at 89 (West 1990):

You must be convinced that the government has proved each of the following beyond a reasonable doubt … Second: That the defendant knew the purpose of the agreement and joined in it with the *intent* to further the illegal purpose…. So, if the defendant … knowingly and willfully joins in that unlawful plan on one occasion, that is sufficient to convict him for conspiracy.

The court defined the substantive offense under section 1956, charged in counts seven and eight, in relevant part as follows, tracking the language of the statute: "You

must be convinced that the government has proved each of the following beyond a reasonable doubt ... Second: That the defendant acted with the intent to promote ... or conceal and disguise...."

Avila requested that the jury be instructed that "willfully" "means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law"; and that "[t]o establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law." On appeal Avila argues that the district court's refusal to issue the instructions he requested constituted reversible error, arguing that "willfulness" is a substantive element of a section 371 conspiracy and that "specific intent" is a substantive element of section 1956(a)(3) money laundering.

First, we find that the conspiracy instruction, as a whole, adequately addressed the burden the government had to bear. The requested instruction as to "willfully" was not necessary. The meaning of "willfully" varies depending upon the context. *See United States v. Bishop*, 412 U.S. 346, 356–61, 93 S.Ct. 2008, 2015–18, 36 L.Ed.2d 941 (1973). The Supreme Court has recognized that in common usage the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional" and that in law the word generally refers to conduct that is not merely negligent. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988).

"Willfulness" appears in neither the section 371 definition of conspiracy nor the section 1956 monetary-instrument laundering statute, and, as defined in Avila's requested instruction, it is not an element of the conspiracy offense, which requires the state of mind necessary for the substantive crime. *See, e.g., United States v. Harrel-*

*son*, 754 F.2d 1153, 1172 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985). The definition of willfulness Avila requested is an exception to the traditional rule and is a statutory element of special treatment of criminal tax offenses. *United States v. Cheek*, —— U.S. ——, ——, 111 S.Ct. 604, 607, 112 L.Ed.2d 617 (1991).

The district court's conspiracy instruction required the jury to find (1) that there was an agreement between two or more persons; (2) that Avila joined the agreement knowing its purpose and with the intent to further the illegal purpose; and (3) that an overt act was committed. Further, the court instructed, "If the defendant knows about a plan, knows that it is an unlawful plan, and knowingly and willfully joins in the unlawful plan ... that is sufficient to convict him for conspiracy." These instructions cover the necessary elements of the conspiracy offense, including the requisite mental state. They thus differ from the charges we rejected in *United States v. Burroughs*, 876 F.2d 366, 369 (5th Cir.1989), which did not require that the defendant have joined the agreement "knowing its purpose and with the intent to further the illegal purpose," and *United States v. Kerley*, 643 F.2d 299, 302 (5th Cir. Unit B Apr. 1981), in which we reversed a criminal conviction for failing to instruct on the element of willfulness where such willfulness was actually a "critical element" of the offense.[4] We thus conclude that the requested instruction on willfulness was not substantially correct, and to the extent that it did accurately reflect the law, it was included in the adequate instruction that the district court gave.

■ Second, we find that to the extent Avila's requested instruction of specific intent was correct, it too was included in the district court's instructions. The court told the members of the jury that they could not find Avila guilty unless they found that

---

**4.** *See also Fifth Circuit Pattern Jury Instructions* § 2.21, at 91 (West 1990) (proposed conspiracy instruction "adequately addresses the requirement of a specific intent to violate the law" if no "special state of mind," *e.g.*, premeditation, re-

quired by substantive offense); *id.* § 1.36 at 52 ("we have attempted to define clearly what state of mind is required, i.e., what the defendant must know and intend to be guilty of the particular crime charged").

he conducted or attempted to conduct a financial transaction involving property represented by a law enforcement officer to be proceeds of the sale of illegal drugs and that he acted with the intent to promote the carrying on of the specified unlawful activity (meaning the drug dealing) or "to conceal and disguise the nature, location, source, ownership and control" of such property. The instruction parallels the wording of section 1956(a)(3) and includes all the elements of intent that Congress deemed necessary for the offense, as is apparent in the language of the statute. If Congress wanted to require any higher *mens rea* requirement, it would have enacted one. *See United States v. Baker*, 807 F.2d 427, 428 (5th Cir.1986).

### VII.

Avila next argues that the district court erred in not instructing the jury as to his ignorance of the law. In *United States v. Davis*, 583 F.2d 190, 194 (5th Cir.1978), we held that "the trial court, when instructing that specific intent is required, may not instruct that ignorance of the law is no excuse, because ignorance of the law goes to the heart of the defendant's denial of specific intent."

In 1989 this court ordered a new trial for defendants who had been convicted of conspiring to commit tax fraud under section 371 and of willfully aiding or assisting fraud in violation of 26 U.S.C. § 7206(2) because "the district court did not instruct the jury that they should, or could, consider the defendants' ignorance of the law." *United States v. Buford*, 889 F.2d 1406, 1409 (5th Cir.1989). Rather, the district court had instructed the jury that "the presumption is that every person knows what the law forbids." *Id.* The *Buford* court, however, interpreted the term "willfully" for purposes of the statute criminalizing preparation of fraudulent tax returns to mean a "voluntary intentional violation of a *known* legal duty" and viewed the absence of a corresponding "ignorance of the law" instruction as "inconsistent with the element of specific intent." *Id.* (citation omitted; emphasis added).

Avila asks us to apply *Buford* to the case at hand, but the reasoning in that case and the others Avila cites does not support such an extension. Avila urges us to hold that the district court erred because it failed to instruct the jury that it could consider Avila's ignorance of the law, despite the critical distinction that its instructions, and the applicable statute, did not require the government to prove that Avila intentionally violated a known legal duty, nor, for that matter, did the court issue an instruction that the jury should presume that Avila knew what the law was.

As we discussed above, such a concept of "willfulness" is not an element of the offenses with which Avila was charged. Because the instruction Avila requested is not a "substantially correct" statement of the law in this context, we affirm the refusal to include it.

Additionally, to the extent the requested instruction might accurately reflect the law, it was included in the instructions the district court issued. The conspiracy instruction told the jury that it could convict Avila only if it found that he joined the plan knowing that it was unlawful, and the substantive offense instructions provided that the defendant must have had represented to him that the funds were proceeds from specified unlawful activities and that he must have participated with the intent to further those activities or to conceal the funds. Lastly, we note that the entrapment instruction allowed the jury to consider whether the government agent impermissibly coaxed Avila into breaking the law, either through convincing him that his acts would be lawful or otherwise.

### VIII.

Arditti challenges the district court's entrapment instructions. The instructions paralleled *Fifth Circuit Pattern Jury Instructions* § 1.28 at 40 (West 1990), and in relevant part provided that

if the evidence in the case should leave you with a reasonable doubt whether the defendants had the previous intent or purpose to commit an offense of the

character charged apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find him not guilty.... The burden is on the government to prove beyond a reasonable doubt that the defendants were not entrapped.

■ Arditti requested that the district court include a sentence immediately after its instruction on the elements of monetary instrument laundering to explain the link between the elements and entrapment: "Even if you find that the government has proved each element of this offense beyond a reasonable doubt, you must acquit the defendant if you find that he was entrapped." First, Arditti asserts that the charge as a whole confused the jury; he relies upon jurors' affidavits to show that they did not understand the entrapment instruction and, thus, could not consider the defense. Second, Arditti claims that because, after the defendant makes a prima facie showing of entrapment, the burden shifts to the government to prove that the defendant was predisposed to commit the offense, *see United States v. Johnson*, 872 F.2d 612, 620 (5th Cir.1989), predisposition becomes an element of the offense. Arditti argues that the government's burden becomes heavier when the court directly instructs the jury to consider entrapment as to each count of the indictment. *United States v. Allibhai*, 939 F.2d 244, 252 (5th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 967, 117 L.Ed.2d 133 (1991).

■ We find that the jury instruction on entrapment was adequate. We first note that the affidavits of juror confusion are not relevant for our decision, as whether a jury misunderstands its instructions is not to be re-examined after the verdict. *Robles v. Exxon Corp.*, 862 F.2d 1201, 1206 (5th Cir.), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 434 (1989). Second, Arditti may satisfy the first part of the three-part test outlined above, for the requested instruction was substantially correct, but Arditti cannot satisfy the second element, as the instruction was substantially given in the charge actually delivered to the jury.

Although the district court would not have erred in issuing the requested instructions, Arditti was not entitled to them. In *Allibhai* we did say that including an entrapment instruction after each count increases the burden the government must bear, but in context the statement merely meant that the defendants could not claim prejudice because the jury was instructed to consider the entrapment defense separately as to each count. 939 F.2d at 252. *Allibhai* does not mean that the defendant is entitled to such a placement of the instruction. The instruction the court gave the jury thus accurately reflected Arditti's rights and the government's burdens under the law.

## IX.

■ Avila and Arditti moved to dismiss their respective indictments prior to trial and timely moved for judgment of acquittal based upon entrapment and outrageous conduct, motions that the district court denied. The entrapment defense involves examination of two factors: (1) government inducement; and (2) the defendant's predisposition, before contact with government agents, to commit the crime charged.

■ Entrapment as a matter of law is established only where a reasonable jury could not find that the government discharged its burden of proving the defendant was predisposed to commit the charged crime. *United States v. Nations*, 764 F.2d 1073, 1077, 1079 (5th Cir.1985). Once a defendant makes a prima facie showing of entrapment by presenting "some evidence that Government conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it," the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime and, thus, was not entrapped. *United States v. Johnson*, 872 F.2d 612, 621 (5th Cir.1989) (citing *Mathews v. United States*, 485 U.S. 58, 65–66, 108 S.Ct. 883, 888, 99 L.Ed.2d 54 (1988)). "[T]his Court must look to the evidence to

determine whether, viewing reasonable inferences and credibility choices in the light most favorable to the Government, a reasonable jury could find, beyond a reasonable doubt, that the defendant was predisposed to commit the offense." *Id.* "On appeal from a conviction wherein the jury has rejected the entrapment defense, the standard of review is the same as that which applies to the sufficiency of the evidence." *Id.* (citing *United States v. Duvall,* 846 F.2d 966, 974 (5th Cir.1988)).

### A.

██ Arditti argues that the government "offered *no* evidence of predisposition" *prior* to Arditti's involvement in the offense, disputing the district court's focus upon Arditti's "willing and active participa[tion] in the scheme" as evidence of his predisposition toward the crime. Looking at the evidence in the light most favorable to the government, though, a reasonable jury could have found beyond a reasonable doubt that Arditti was predisposed to money laundering and thus was not entrapped.

As in *Nations,* 764 F.2d at 1077, there was "no overwhelming evidence of serious resistance" by Arditti. According to the agent's testimony, after Gallman told Arditti that the source of the money involved in the proposed real estate investment was "coke money," but that if Arditti did not want to be involved in such a deal he could just walk away, Arditti replied, "You don't see me going anywhere." Although Arditti did not initially seek out the government agent, "an opportunity was provided and [Arditti] jumped in with both feet," helping Gallman formulate plans to launder the "drug" money and advising him on ways to avoid arousing governmental suspicion. *Johnson,* 872 F.2d at 621 (enthusiasm evidenced predisposition, even though government initiated illegal scheme). A jury could view Gallman's testimony and the tape recordings and video recordings of Arditti as proof that Arditti was an " 'eager, active participant' " in money laundering. *Duvall,* 846 F.2d at 974 (quoting *Nations,* 764 F.2d at 1077).

### B.

██ Avila similarly argues that the government's evidence of predisposition falls short. Our response is the same: Despite Gallman's initiation of contact with Avila and Gallman's provision of the opportunity to launder drug funds, Yanez's testimony that he told Gallman that Avila "has a lot of clients from Mexico in the same business you are," Avila's complete lack of resistance, and Avila's energetic participation in the plan to launder "drug" money show that a reasonable jury could have found that he was predisposed to engage in money laundering. The entrapment defense in this case, "as in most cases, was not resolvable by the court as a matter of law." *Nations,* 764 F.2d at 1077.

### C.

Both appellants also charge that their convictions should be overturned because the government investigation constituted outrageous conduct. We traced the evolution of the "outrageous conduct" defense in *United States v. Allibhai,* 939 F.2d 244, 248 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1991). We recalled that a plurality of the Supreme Court, discussing the entrapment defense, noted in 1973 that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from ... obtain[ing] a conviction." *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). Although many have asserted the defense, "a due process violation will be found only in the rarest and most outrageous circumstances." *United States v. Duvall,* 846 F.2d 966, 973 (5th Cir.1988) (citation omitted).

██ A defendant must prove not only "government overinvolvement in the charged crime," but also that he has not been an "active participant in the criminal activity which gave rise to his arrest." *Nations,* 764 F.2d at 1077. In finding no due process violation, the *Allibhai* panel ob-

served "[a] litany of cases in which more extreme government behavior was upheld by courts." *Allibhai,* 939 F.2d at 248 (citations omitted); *see Duvall,* 846 F.2d at 975. A review of Arditti's and Avila's arguments on this issue leads to the same conclusion. *See Allibhai,* 939 F.2d at 249 (rejecting defendants' argument that the "government's conduct in approaching [defendant] with the money-laundering scheme was egregious enough to constitute a due process violation.").

### D.

■ Arditti maintains that the government engaged in outrageous behavior by targeting him without a reasonable suspicion of predisposition to launder monetary instruments. We already have rejected a similar argument, however. This court applies the prohibition against governmental targeting of defendants in an investigation "only where the government employs a contingent fee informant and directs him to implicate specific individuals." *United States v. Nissen,* 928 F.2d 690, 693 (5th Cir.1991) (citation omitted). In any event, Arditti has produced no evidence that he was the target of the IRS investigation. He was brought into the money laundering plot by his co-conspirator, Yanez.

Arditti also argues that the government's overinvolvement in the offense and the pressure its agents exerted on him constituted outrageous conduct. This argument also fails, as the quantum of governmental activity did not exceed levels previously condoned by this and other courts, *see, e.g., United States v. Tobias,* 662 F.2d 381 (5th Cir. Unit B Nov. 1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982), and Arditti actively participated in the criminal activity by formulating and carrying out investment plans for the "drug" money.[5]

### E.

Avila asserts that the government's conduct was outrageous because Gallman initi-

ated all contacts and meetings with Avila and, further, misrepresented the legality of Avila's participation and the business of the corporation. Avila seemingly confuses the predisposition element of establishing the entrapment defense with the necessary proof of outrageous conduct. Avila actively participated in the money laundering, and he has far less of an argument for government overinvolvement than does Arditti.

### F.

■ Arditti further invokes a Ninth Amendment argument that "a person's liberty, or right to be left alone, is violated when the government persists in attempts to engage the individual in criminal conduct after he has declined to become involved." He suggests that we adopt a bright-line rule that once a subject of investigation states that he does not wish to participate in illegal activity, government agents must leave him alone. *Cf. Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (once suspect requests a lawyer, police must stop interrogation and cannot resume it unless suspect initiates discussion and waives rights).

Nothing in the case law, the statutes, or the constitution requires such a rule, however. In *Allibhai* we rejected the claim that the right to be left alone forbids the government from targeting an individual in an investigation without a preexisting reasonable suspicion that the subject has been involved in wrong-doing. 939 F.2d at 249 & n. 3 (citing *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). We then stated that where governmental excess ensnares a nonpredisposed individual, the entrapment defense should be sufficient to protect him. As discussed above, Arditti was not entrapped as a matter of law, and the government's behavior here

---

**5.** *See Allibhai,* 939 F.2d at 248–49 (discussing cases); *accord United States v. Yater,* 756 F.2d 1058, 1067 n. 12 (5th Cir.) *cert. denied,* 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985) (discussing outrageousness of government's conduct in manufacturing drugs "with only meager assistance from the defendants" in *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978)).

does not rise to the level of outrageous conduct.

## X.

■ Both before and at trial, Arditti subpoenaed IRS documents including those showing the "nature, goals and targets of its operation," asserting their relevance to his lack of predisposition for his entrapment and outrageous-conduct defenses. Arditti maintains that he needed the information to complete his defense and to summon all minimally reliable evidence in that regard, as guaranteed by the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment. Following the government's statement that the internal memoranda and documents generated by an agency are privileged and thus not subject to discovery, the district court granted the government's motion to quash the trial subpoena because the subpoena constituted a discovery request, bordering on a fishing expedition. Arditti asserts that because the district court neither held a hearing on the motion to quash nor availed itself of the opportunity offered by the government to view the documents *in camera,* his rights were violated, and he requests a hearing wherein the government will be required to show that its privilege as to the documents should overcome his right to present evidence in his defense.

We review a grant of a motion to quash a subpoena for abuse of discretion. *Cf. United States v. Reeves,* 892 F.2d 1223, 1226 (5th Cir.1990) (upholding district court's refusal of pretrial request to inspect government files under Fed. R.Crim.P. 16(a)). We find that the district court did not abuse its discretion in quashing the subpoena.

Rule 16(a)(1) precludes "the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case...." Arditti essentially argues that the "subpoena at issue is a trial subpoena," covered by Fed.R.Crim.P. 17, which rule 16

does not govern because it only applies to "discovery of evidence *prior* to trial." Certainly Arditti could not gain discovery to the subpoenaed material under rule 16. Moreover, he does not establish that even the potentially longer reach of rule 17(c) stretches to those materials.

Our analysis of this issue begins with *Bowman Dairy Co. v. United States,* 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951), which discusses the relationship between rule 16 and rule 17(c). There, the Court upheld an antitrust defendant's subpoena directing the government to produce documents, books, and objects it had obtained during the course of its investigation, even though such materials were not discoverable under rule 16. The district court held that the defendant might be able to obtain some such materials under rule 17(c), "as long as they are evidentiary." *Id.* at 219, 71 S.Ct. at 678. Although rule 17 extends to materials not subject to rule 16 discovery, it is not intended to provide an additional means of discovery. *Id.* at 220, 71 S.Ct. at 679. Every subpoena must be a "good faith effort ... to obtain evidence," and the district court may ensure that rule 17(c) is used only to that end through the court's power to quash or modify subpoenas. *Id.* at 219–20, 71 S.Ct. at 678–79.

The Court enunciated the burden a party must bear to gain access to materials under rule 17 in *United States v. Nixon,* 418 U.S. 683, 697–702, 94 S.Ct. 3090, 3102–05, 41 L.Ed.2d 1039 (1974). On appeal, Arditti must satisfy three requirements. He must show that (1) the subpoenaed document is relevant, (2) it is admissible, and (3) it has been requested with adequate specificity. *Id.* at 700, 94 S.Ct. at 3103. These specificity and relevance elements require more than the title of a document and conjecture as to its contents. In *Nixon,* the Watergate special prosecutor was permitted to obtain audio tapes that the president was trying to retain, because he had shown that "there was sufficient likelihood that each of the tapes contain[ed] conversations relevant to the offenses charged in the indictment." *Id.* He met this burden by offering sworn testimony of participants in the

recorded conversations, or by giving reasons that permitted a rational inference of relevance, as well as by making a sufficient preliminary showing of admissibility.

We conclude that Arditti did not meet his burden under rule 17 and *Nixon*. In quashing the subpoena, the district court found that "I think it's not only discovery, but borders on a fishing expedition." This finding is supported by Arditti's argument before us: "The government's purpose, method and means of targeting and then pursuing Mr. Arditti are relevant to both the entrapment and the due process defenses. *To ascertain these particulars,* Arditti sought the documents that would set forth the objectives of the undercover operation and the intended targets of that operation." (Emphasis added.)

Arditti thus has failed to establish with sufficient specificity the evidentiary nature of the requested materials. He has demonstrated why he wants to look into the material, but he has not set forth what the subpoena's materials contain, forcing the court to speculate as to the specific nature of their contents and its relevance. Accordingly, it appears that Arditti was attempting to use the subpoena to gain knowledge that he could not obtain under rule 16(a)(1), as much as to obtain evidence, i.e., that he was trying "to use the subpoena duces tecum as a discovery device, which it is not." *United States v. Nixon,* 777 F.2d 958, 969 (5th Cir.1985). In this context, the district court did not abuse its discretion in quashing the subpoena.

AFFIRMED.

GOLDBERG, Circuit Judge, specially concurring:

When one door closes, fortune will usually open another.[6]

The Rule 16 door closes, so a criminal defendant attempts to pry open the Rule 17(c) portal. The district court, as keeper of the Rule 17(c) gate, hears the chanting of the "open sesame!" incantation[7]—"let me obtain the evidence"—but cannot unlock the entry, for the recitation fails to satisfy the demanding requirements of Rule 17(c). I concur in the majority opinion and write merely to elucidate the distinction that I see between Rules 16 and 17(c) and to explain the district court's duties, as I see them, in evaluating a Rule 17(c) subpoena *duces tecum. See* Majority Op. at 345–46.

The issue is whether Arditti satisfied the requirements of Federal Rule of Criminal Procedure 17(c), "which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings." *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974). Rule 17(c) provides that "[a] subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein." Fed.R.Crim.P. 17(c).

Certainly a Rule 17(c) subpoena *duces tecum* is not a discovery device. *Nixon,* 94 S.Ct. at 3103 (citing *Bowman Dairy Co. v. United States,* 341 U.S. 214, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951)). Rule 17(c) is not intended "to provide an additional means of discovery beyond that provided in Rule 16." *United States v. Vanegas,* 112 F.R.D. 235, 238 (D.N.J.1986) (citations omitted); *see United States v. Nixon,* 777 F.2d 958, 968–69 (5th Cir.1985); *United States v. Marcello,* 423 F.2d 993, 1006 (5th Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). This is because a "Rule 17(c) subpoena reaches only *evidentiary* materials"—not all *discoverable* materials. *United States v. Cuthbertson,* 651 F.2d 189, 195 (3rd Cir.) (citing *Bowman Dairy,* 71 S.Ct. at 679) (emphasis added), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981).

However, "[a]ny document or other materials, *admissible as evidence* ... is subject to subpoena" under Rule 17(c). *Bowman Dairy,* 71 S.Ct. at 679. Rule 16, which severely restricts discovery in crimi-

---

6. Fernando de Rojas, *La Celestina* act XV.

7. *The Arabian Nights (A Thousand and One Nights)—The History of Ali Baba* (Galland trans.); *cf.* William Shakespeare, *Macbeth* act IV, sc. i ("Open, locks, Whoever knocks.").

nal cases, does not define the outer limits of materials available under a 17(c) subpoena, nor how wide the Rule 17(c) door will open. Indeed, documents and materials possessed by the government but not discoverable under Rule 16 can be reached by a Rule 17(c) subpoena—so long as the documents and materials are evidentiary. *Cf. id.* at 678.

The rule allows "[t]he court on motion made promptly [to] quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed.R.Crim.P. 17(c); *see also Nixon,* 94 S.Ct. at 3103. The district court thus controls the opening of the Rule 17(c) gate by wielding "its power to rule on motions to quash or modify." *Bowman Dairy,* 71 S.Ct. at 678. Under the Rule 17(c) standard, then, the district court must determine whether the subpoena constitutes a "good-faith effort ... to obtain evidence." *Id., cited in United States v. Noriega,* 764 F.Supp. 1480, 1493 (S.D.Fla.1991). A party does not have to use all materials subpoenaed under 17(c) in evidence to satisfy this test. *Id.* Rule 17(c) merely requires that the moving party make a good faith effort to obtain evidence—instead of embarking on "a fishing expedition to see what might turn up." *Id.* at 678, 679 (holding subpoena's "catch-all

provision ... not intended to produce evidentiary materials"); *see In re Martin Marietta Corp.,* 856 F.2d 619, 622 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989).

To this end, a party demanding materials must unfasten three locks to free the 17(c) door. The rule requires not only that the materials be relevant and admissible, but also that the demand must be sufficiently specific as to the documents requested. *Nixon,* 94 S.Ct. at 3103 (setting out the showing necessary to require production prior to trial under 17(c)).[8] We entrust these decisions to the discretion of the trial court "since the necessity for the subpoena most often turns upon a determination of factual issues." *Id.* at 3104.

In the ordinary case, I would expect the district court to *review* the material *in camera* to determine whether the specificity, relevancy and evidentiary nature of the material warrants its production.[9] This case is the rare exception: the district court did not avail itself of the opportunity to review the material *in camera* before deciding to grant the motion to quash the subpoena. Rather, the court determined, without *in camera* review, that Arditti sought to travel the forbidden path—he

---

**8.** *See United States v. Komisaruk,* 885 F.2d 490, 495 (9th Cir.1989) ("A court is justified in quashing a subpoena duces tecum if production would be immaterial, unreasonable, oppressive and irrelevant."); *Martin Marietta,* 856 F.2d at 621 ("Enforcement of a Rule 17(c) subpoena is governed by the standards established in *United States v. Nixon.*"); *Cuthbertson,* 651 F.2d at 197 ("we emphasized that the material sought by the rule 17(c) subpoena must be evidentiary and relevant") (Sietz, C.J., concurring) (citations omitted); *Vanegas,* 112 F.R.D. at 239 ("relevant evidentiary materials subject to subpoena under Rule 17(c)").

**9.** *See, e.g., Nixon,* 94 S.Ct. at 3103 (concluding that a "sufficient likelihood" existed that the content of the tapes were "relevant" and "admissible"); *United States v. Fowler,* 932 F.2d 306, 311–12 (4th Cir.1991) (affirming district court's denial of application for subpoenas because district court properly determined that information sought was irrelevant and had no evidentiary value); *Martin Marietta,* 856 F.2d at 622 (upholding district court's order compelling production of materials under 17(c) because district court properly determined that subpoena

satisfied *Nixon* requirements after *in camera* production of documents, but remanding for *in camera* review as to claims of work-product privilege); *United States v. LaRouche Campaign,* 841 F.2d 1176, 1180 (1st Cir.1988) (affirming district court's order requiring production of documents for *in camera* review because threshold showing of "admissibility, relevancy, and specificity" meant the subpoena was not "unreasonable or oppressive" under 17(c)); *Nixon,* 777 F.2d at 969 (affirming district court's refusal to order production of government files under 17(c) because *in camera* inspection revealed that materials were not relevant); *Cuthbertson,* 651 F.2d at 195 (reversing order releasing materials because district court did not use its *in camera* review to "evaluat[e] the material against the evidentiary requirement of rule 17(c)"); *United States v. Poindexter,* 732 F.Supp. 135, 138, 141 (D.D.C.1990) (ordering disclosure of certain documents after briefing by the parties and *in camera* review to determine relevancy under 17(c)); *Vanegas,* 112 F.R.D. at 239 (granting motion to compel production of handwriting exemplars prior to trial under 17(c) based on determination of relevancy and admissibility).

wanted to embark on a "fishing expedition to see what might turn up" on the other side of the Rule 17(c) gate. If Arditti *had* displayed the three *Nixon* keys—that is, made a threshold showing that the demand was specific and the material relevant and admissible—then the district court would have abused its discretion by not peering through the keyhole and reviewing the material *in camera*. But Arditti did *not* brandish the keys labelled "specificity," "relevancy" and "admissibility." The court properly denied entry because fortune alone will not open the Rule 17(c) door.

